301 So.2d 391 (1974)
Maxie JOSEPH, wife of/and Louis Joseph, Individually and on Behalf of his minor children, Dexter, et al.
v.
Maurice MIRANDA, Individually and on Behalf of his minor son, Matthos Miranda, and Government Employees Insurance Company.
No. 6374.
Court of Appeal of Louisiana, Fourth Circuit.
October 9, 1974.
*392 Thomas M. Willmott, Metairie, Peter J. Vernaci, New Orleans, for plaintiffs-appellees.
Hammett, Leake & Hammett, John I. Hulse, IV, New Orleans, for defendants-appellants.
Before REDMAN, GULOTTA and MORIAL, JJ.
MORIAL, Judge.
Defendants have taken this suspensive appeal of a judgment of the District Court awarding plaintiffs damages in the amount of $7,875.65[1] arising out of a rear end automobile collision.
*393 The accident occurred at the corner of Elysian Fields and North Claiborne Avenues in New Orleans on June 13, 1971. Plaintiff, Mrs. Maxie Joseph, with her seven children and her mother, Mrs. Jessie Galloway, as passengers was driving her vehicle in a downtown or easterly direction on North Claiborne Avenue when it was struck on the left rear by the right front of the vehicle of Government Employees Insurance Company's (GEICO) insured. The collision occurred in the neutral ground portion of Elysian Fields Avenue where it crosses North Claiborne Avenue.
Defendants contend the plaintiffs' awards were excessive in light of the medical evidence presented. They further argue that since Dr. Pratt was on vacation and did not see the patients from the end of June until August 5 that the doctor should not be compensated for any visits past June 30. This latter contention is meritless. Dr. Pratt's unrefuted testimony was that the diathermy department of his office provided the treatments and his associate physician was instructed to see his patients at patients' request and either discharge or treat them during his vacation.
We are first presented with the fact issue of whether plaintiff Mrs. Maxie Joseph, did in fact switch lanes abruptly in front of the Miranda vehicle thereby causing the accident. If the accident did occur as defendants contend there is no liability. See Trabeaux v. Sanchez, 279 So.2d 793 (La.App.4th Cir., 1973); Canzoneri v. Connecticut Fire Insurance Co. of Hartford, 163 So.2d 834 (La.App.4th Cir., 1964). Necessary to a determination of whether this rule of law applies is a review of the testimony.
Plaintiffs first witness was Ernest Johnson, a long time casual acquaintance who just happened to be an eye witness to the accident. He testified that he was the lead car in the left lane on the river bound up-town side of Elysian Fields and saw both cars enter the neutral ground area and the accident happen. He testified that at no time did the Joseph vehicle change lanes. He further stated that the number two car, or the Miranda auto, speeded up before running into the rear of the plaintiff's car. Plaintiffs proceeded with the testimony of Mrs. Joseph, her mother and two of her children who all were passengers in the Joseph car at the time of the accident. Each testified that at no time did the Joseph auto change lanes and that they had been in the right lane of travel for several blocks.
Matthos Miranda testified that the Joseph car went past him while he was in the river bound lane of Elysian Fields and jumped ahead of him just as he entered the neutral ground area where he was to stop. He stated that the rear end of the car seemed to be lifted so that you could reach under the car and "grab the shocks." Defendants called as their witness, Barbara Martin, a passenger in the Miranda car. She testified that the Joseph car went past them and she saw the back of that car going up as it hit the brakes for its stop. Defendants other witness was Patrick Kelly, an employee of the Shell service station located on the corner of the outbound downtown side of Elysian Fields and North Robertson Street. He testified that the Joseph car was in the left lane and it jumped in front of the defendant's car as it passed the intersection of Elysian Fields and North Claiborne; it was impossible for the defendant to stop in time because of the actions of Mrs. Joseph.
When confronted with such conflicting testimony as in this case, the present jurisprudence in Louisiana commands a Court of Appeal to accord such weight to factual findings of the lower court as they deserve and avoid retrying cases from the record, particularly if the outcome was influenced by the credibility of witnesses appearing before the trial court which has the duty to evaluate their testimony. Crane Supply Company v. Drake & Planche, Inc., 255 So.2d 188 (La.App.4th Cir. 1971) and Shelts v. Jackson, 254 So.2d 668 (La.App.4th Cir. 1971).
*394 The trial court after hearing the testimony in rendering judgment assigned written reasons for judgment. We quote in full:
"This is another accident case, in which there is a complete contradiction of how the accident happened. The court is of the belief that the accident happened as indicated by the plaintiffs and the witnesses produced by them."
A review of the record coupled with the jurisprudential rules to be applied to this case convinces us that there was no manifest error on the part of the district court and the judgment of the lower court as to the negligence of the operator of the Miranda vehicle must be affirmed. Readco Industries, Inc. v. Myrmax Specialties, Inc., 236 So.2d 573 (La.App.1st Cir., 1970); Ricks v. Associated Indemnity Corporation, 242 So.2d 346 (La.App.4th Cir., 1970).
Did the trier of fact abuse his "much discretion" in the amount of damages awarded? The answer is no and we review the medical testimony.
Wade Joseph, age 11, received contusions to his left arm and elbow causing swelling. He visited the doctor on June 14 and was discharged on June 28. Derrick, age 3½, had swelling of the right shin and was seen by the doctor on June 14 and again on June 21 when he was discharged. Yvette, age 7, had a contusion of the right forehead and the right eye. She was treated from June 14 to July 2, 1971. Dexter, age 15, received a contusion to the top of his head and a contusion to the right shoulder. He was treated from June 14 to June 21, 1971. Each child received moist heat treatments two or three times a day until a clearing of the symptoms occurred and each was incapacitated from one to two weeks. Each was awarded $250.00 by the trial judge. Under the circumstances we do not think the awards exceed the limits of the trial court's "much discretion," LSA-R.C.C. Article 1934(3).
Mrs. Maxie Joseph was seen by the doctor on June 14, 1971. At that time she complained of severe headaches and pain in the neck. The next morning she had pain in the anterior chest and lower back. Examination showed a moderate muscle tightness and moderate tenderness of the trapezius muscle and the sternocleidomastoid muscles of the neck bilaterally. Spasm was present in this area. There was also moderate muscle tightness and moderate tenderness of the paravertebral muscles of the lower back bilaterally. It was Dr. Pratt's impressions that she had received a moderately severe muscle strain of the neck, a contusion of the anterior chest and moderately severe muscle strain of the lower back. Her treatment started on oral muscle relaxants and analgesics three times daily. She received microwave diathermy treatments to the neck and lower back daily for two weeks until June 30, 1971 when she exhibited a lack of muscle spasm. At that time her diathermy treatments were reduced to three times a week. Her treatments continued until August 8, 1971 when there was very little muscle tightness on examination of the musculature of the neck and the lower back. Diathermy treatments were discontinued at this time and muscle relaxants and analgesics were prescribed. She was last seen in Dr. Pratt's office on August 19, 1971. At this time she had no further complaints of pain in the head, neck, chest or lower back. Mrs. Joseph saw Dr. Pratt three times and had 29 treatments for her back.
Carlette Joseph, age 13, was seen by Dr. Pratt on June 14, 1971. It was his findings that she received a contusion of the right side of the head and a moderately severe muscle strain on the right side of the neck. She was started on oral muscle relaxants and analgesics twice daily. She was also started on "hydraculator pack" treatment to the right side of the neck. She was treated daily for two weeks which treatment was then decreased to three *395 times weekly. She continued on this management until August 5, 1971, at which time she had no further complaints of pain in the neck or head. She was incapacitated in all a total of seven weeks.
Maureen Joseph was seen by Dr. Pratt on June 14, 1971 at which time his clinical impression was that she had received a contusion of the lower left jaw and a moderate severe muscle strain of the neck more on the left side. She was treated oral muscle relaxants and analgesics twice daily. She was put on "hydraculator pack" treatments to the front and back of her neck for two weeks daily. This treatment was then decreased to three times weekly. She was last seen by Dr. Pratt on August 5, 1971. She had no further muscle tightness or spasms at that time. She was in discomfort and incapacitated for a period of seven weeks.
Keith Joseph was seen also on June 14, 1971. It was Dr. Pratt's clinical impression at that time that he received a contusion of the right side of the head, a muscle strain of the neck and a contusion of the mid back. His treatment consisted of heat applications to the neck and back at home two or three times daily. He was seen again on June 21, 28 and July 2, 1971. Each time he complained of pain and muscle tightness of the trapezius muscle of the neck bilaterally with more tenderness on the left side. He was started on "hydraculator pack" treatments to the neck three times weekly in the office. He continued on this until his last examination on August 5, 1971, at which time he had no further complaints of pain in the head, neck or back. Keith was discharged on August 5, 1971, after seven weeks of discomfort.
Mrs. Galloway was seen on June 14, 1971 by Dr. Pratt. She was treated for head, neck and right shoulder pain. She had tenderness in her lower back and a small abrasion of the right shoulder. It was his objective findings that there was muscle strain of the neck and a contusion and abrasion of the right shoulder and a very light strain in the lower back. She received relaxants and analgesics for pain. She was then given microwave diathermy treatments in the office. She was treated five days weekly for two weeks and three times weekly until August 5, 1971 visited Dr. Pratt's office for treatment 27 times in seven weeks.
Each of these individuals received an award for damages of $1,000.00 except Keith Joseph who received $750.00. Each individual was incapacitated for a period of between six and eight weeks and was given treatment for at least five weeks in the office of Dr. Pratt.
From our evaluation of the medical testimony and the application of the principles stated in Miller v. Thomas, 258 La. 285, 246 So.2d 16 (1971), we cannot conclude that the awards are excessive or that the trial judge violated the mandate of LSA-R.C.C. Article 1934(3) which provides:
"In the assessment of damages under this rule, as well as in the case of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury. * * *"
The medical testimony of Dr. Pratt cannot be discounted by us as the defendants urge. His testimony was received in his capacity as a licensed general practitioner of medicine. We are certain the trial court evaluated it on that basis in determining the awards made.
The judgment of the district court is affirmed.
Affirmed.
NOTES
[1] We note defendant's brief states the total judgment of be $5,551.65 while in their appeal bond they state it is $6,724.50, plus legal interest. Both figures are apparently incorrect. Our computation for the total amount awarded all plaintiffs is $7,875.65.